**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

November 17, 2022

**BY ECF AND EMAIL**
Honorable Andrew L. Carter, Jr.
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

       **Re:   United States v. Richard Hall,**
           **21 Cr. 643 (ALC)**

Dear Judge Carter:

     Richard Hall was just 18 years old at the time of his offense conduct in this case, selling five firearms over state lines without a license in early 2020. He spent the modest amount he made on basic necessities: rent, food, diapers, baby clothes.

     Richard's poor decision to sell guns is mitigated by his youth and his tragic personal history of losing his own loving father to death at a young age and being thrust into urban poverty. Equally significant are Richard's positive personal characteristics: he is a devoted father and essential caretaker to his three young sons.

     This offense represents Richard's first and only criminal conviction, and he has already suffered substantial restrictions on his liberty as a result of it. He was imprisoned for approximately one month following his arrest in September 2021; since being released on bail, he has spent 13 months on home detention. In the unique circumstances of this case, this time that he has served is a sufficient sentence and any additional term imprisonment would be greater than necessary.

**Richard Hall's Personal History and Characteristics**

     Now 21 years old, Richard Hall was born in Lenoir, North Carolina in 2001. He spent his early years in a happy two-parent home. His father, Craig Hall, earned a good living; his mother, Nashia Banner, was a homemaker and cared for Richard and his four siblings in a two-story house. Richard was loved and supported and enjoyed the routine of church and school, birthdays and holidays. He was close to his father.

Richard's childhood was turned upside down in 2009, when he was 8 years old.  That's when his father died suddenly—of sepsis from a dental abscess.  The family barely had time to process the emotional trauma of Craig's death before financial disaster that arrived on its heels: Nashia had five children and no income.  After losing his father, Richard lost his home, his school, and his friends as Nashia relocated the family to New York, where she had been raised and where her mother lived.

Thus Richard spent his adolescence in poverty in a dangerous area of the Bronx.  His mother worked but struggled to pay the bills and put food on the table.  When they were fortunate, the family had a small NYCHA apartment.  When they were less fortunate, they were homeless, living in family shelters.

Richard tried to earn money by reselling candy, water bottles, and even hand-written comic books.  He gave his earnings to his mother or spent it on his siblings.  Richard's sister Carlesha describes how he sold candy bars and fruit snacks so she could have a small 12th birthday party in a park, as just one example of "the lengths he went to to support his family or make us any way happier."  **Exhibit A** at 1 (Letter of Carlesha Hall).

Richard's life changed again when he was 15, with the birth of his now-five-year-old son, ███████.  In the words of his sister, Richard "did not run from [fatherhood], he ran to it."  Id.  ███████ was born in North Carolina, so Richard and his family returned to Lenoir.  ███████'s mother, who was also 15, was unready for children; ███████ was soon in sole care of Richard and his mother, Nashia.  But Richard had, in the memory of his father, a role model and a mission.  **Exhibit B** at 1 (Letter of Khalil Abdus-Shahid) ("He's always promised me that when he had children, he would be a father to them much like his father was a father to him and his siblings.  I can honestly say that my grandson has been making good on his commitment to his children.").

Richard now has two additional children with his long-term partner, Jau'Da Killian.  Both were born after the offense conduct in this case.  ███████ is two years old, and ███████ was born three weeks ago, on October 27, 2022.[1]  Jau'Da writes that Richard "will go over and beyond to make me and our kids smile, he is the best father and a good person.  There is so much I can say about him and the great things he has done but watching him do anything in this world for our kids is definitely my favorite."

---

[1] ███████'s health has been precarious.  ████████████████████████

**Exhibit C** at 1 (Letter of Jau'Da Killian).  "With his dad not here, he tries to fulfill the outstanding shoes of Craig since it was cut short for him." **Exhibit D** (Letter of Nashia Banner).  "Being a father is the most important thing to my brother, all he ever wanted for his children is to have the life we had growing up before our father passed."  Ex. A at 2.

 

## The Nature and Circumstances of the Offense

Richard has accepted responsibility by pleading guilty to sole count of the indictment, which charged him with buying and selling firearms in interstate commerce without a license in January and February 2020, when he was 18 years old.  He engaged in this conduct in a poorly judged attempt to make money at a difficult time.  The modest profits he made ($3,800 gross, less the money he had borrowed to buy the firearms in the first place) went to contribute to his great-grandmother's rent (as she had been demanding and threatening to kick them out) as well as food and necessities for his then-two-year-old son, ▮▮▮  Richard did not know that one of the guns he bought and sold had previously been stolen.

Richard's arrest and prosecution in this case has had a profound effect on him.  He was arrested on September 22, 2021, at a McDonald's in Lenoir, where he was picking up food with ▮▮▮ (then four).  Richard recalls being panicked about what would happen to his son—it seemed as if the police were

just going to leave him there alone, but Richard's family became aware of his arrest and came to take ▮▮▮▮ home.  After that, Richard spent a month in custody before he was transported to New York and released on home detention.

For the past 13 months, Richard has been on home detention.  While he is grateful for every day home with his family, home detention has prevented him from spending as much time as he wants to with ▮▮▮▮ who continues to reside with Richard's mother.  Richard most regrets not being able to meet ▮▮▮▮ Kindergarten teacher and to drop him off and pick him up from school.  "Richard has missed school events because he's not allowed to leave the house.  I see guilt and remorse in him all the time.  Having a son, I understand the weight Richard feels."  Ex. A at 2.  But "[b]eing home all this time has been good for Richard, and I've seen him grow up a lot.  He's a lot more calm now. . . . he has more patience."  Id.

Home detention affects every aspect of Richard's life.  When Jau'Da's water broke and ▮▮▮▮ came three weeks early, Richard's first call was to his Pretrial Service's officer, requesting permission to accompany her to the hospital.

Over the same period, Richard had reflected on his offense and expressed his sincere remorse.  "He would take back everything he did if given the opportunity to and he acknowledges the mistakes he made."  **Exhibit E** (Letter of Caasan Hall).  He has grown noticeably older and "[a]s a person, he's grown tremendously since the time he took the actions that bring us here today."  **Exhibit F** (Letter of Ibn Khalil A.).  "He has learned so much from this case . . . Since this case, our relationship has been even stronger.  We argue less, he is more patient, and I think we both remember what is really important in life."  Ex. C at 1.

### THE APPROPRIATE SENTENCE IS TIME SERVED.

"In deciding what sentence will be 'sufficient, but not greater than necessary' to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

Time served is the parsimonious sentence in this case because Richard's offense is mitigated by his personal history and characteristics and because he has already been sufficiently punished and deterred by his first conviction, a month's imprisonment, and 13 months' home detention.  Any

further term of imprisonment would be greater than necessary because it would needlessly separate Richard from his three young sons who need him.

In considering Richard's mitigating personal history and positive characteristics, § 3553(a)(1), the Court should give special weight to his youth: he was just 18 years old at the time of the offense conduct and is still only 21 now. The Supreme Court has time and again recognized "the mitigating qualities of youth" to be considered at sentencing. Miller v. Alabama, 567 U.S. 460, 476 (2012). In particular, the Court has noted that young persons have "diminished culpability and heightened capacity for change." Id. at 479.

> [Y]outh is more than a chronological fact. It is a time of immaturity, irresponsibility, impetuousness[,] and recklessness. It is a moment and 'condition of life when a person may be most susceptible to influence and to psychological damage. And its signature qualities are all transient.

Id. (internal quotation marks and citations omitted). The Supreme Court noted that these conclusions rest "not only on common sense—on what 'any parent knows'—but on science and social science as well." Id. at 471.

Although Miller was addressed to juveniles, its discussion applies equally to young adults. The National Institute of Justice ("NIJ"), the research, development and evaluation agency of the U.S. Department of Justice, has conducted research on juvenile and young adult offenders and concluded that "young adult offenders ages 18–24 are more similar to juveniles with respect to their offending, maturation and life circumstances." See NIJ, From Juvenile Delinquency to Young Adult Offending (2014), available at https://nij.ojp.gov/topics/articles/juvenile-delinquency-young-adult-offending. NIJ recommendations included the establishment of "special courts for young offenders ages 18–24" and an "'immaturity discount' for young offenders that would involve a decrease in the severity of penalties, taking into account a young person's lower maturity and culpability." Id.

With respect to the purposes of sentencing, Richard has already been effectively punished and deterred. § 3553(a)(2)(A)–(B). This case represents his first and only conviction. A first felony conviction is itself a significant sanction carrying life-altering collateral consequences. See generally United States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) ("Today, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."). Richard's lack of prior convictions also means that the month he spent in jail represents a more

Honorable Andrew L. Carter, Jr.                    November 17, 2022
United States District Judge                              Page 6 of 8

significant punishment and deterrent for him than it may be for other defendants.  See, e.g., United States v. Mishoe, 241 F.3d 214, 220 (2d Cir. 2001) (recognizing in the context of the career offender guideline that the amount of prior prison time is relevant to determining the deterrent effect of the sentence to be imposed); see also, e.g., United States v. Baker, 445 F.3d 987, 992 (7th Cir. 2006) (affirming below-Guidelines sentence on government's appeal, and approving of "the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned") (citing § 3553(a)(2)(A)–(B)); United States v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

The Court should give separate consideration to the 13 months that Richard has spent on home detention.  Home detention is such a significant restriction on a person's liberty that both Congress and the Sentencing Commission have equated it with imprisonment.  See 18 U.S.C. § 3563(b)(19) (home detention may be imposed  as a condition of probation "only as an alternative to incarceration"); U.S.S.G. § 5C1.1 (e) (3) ("Schedule of Substitute Punishments") (If giving a non-incarceratory sentence, one day of home detention is equal to one day of imprisonment); § 5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment."); see also United States v. Fiume, 643 F. App'x 25, 28 (2d Cir. 2016) ("Home detention is a distinct condition that is significantly more onerous than GPS monitoring.").  Although federal defendants do not receive credit from the BOP for time spent on home detention, credit is the norm in several states.  See Kate Weisburd, *Punitive Surveillance*, 108 Va. L. Rev. 147, 181 & n.211 (2022) (collecting cases).

The sentencing purposes of incapacitation and rehabilitation also do not suggest that it is necessary to remove Richard from the community.  See § 3553(a)(2)(C)–(D).  Richard has been compliant with Pretrial supervision for over a year and "is not viewed as . . . a danger to the community."  PSR at 26.  "[I]mprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

On the contrary, Richard is needed at home to care for his three young sons and imprisoning him at this stage would work an unnecessary hardship on them.  Jau'Da writes: "I pray he can be here to see our new baby boy grow up.  He knows he cannot miss out on all the beautiful moments with his children."  Ex. C at 2.

> Even today, I'm at the hospital with ████████ because he is sick ███████████. Richard is home with ████████████, our two-year-old, because he has ████████████████████████████████ With two sick babies, I don't know what I'd do without Richard around. It's hard to even think about.

Id.

An April 2016 report by the Annie E. Casey Foundation documents "the devastating toll of parental incarceration on kids, families and communities." **Exhibit G** (Report of the Annie E. Casey Foundation, "A Shared Sentence"). It finds:

> Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce, with a potentially lasting negative impact on a child's well-being. These young children lose a parent's support during their critical early years, a time when their families and communities should be laying the foundation for healthy development and success.

Ex. G at 3.

The Court should therefore impose a sentence of time served, giving no deference to the advisory Guidelines range of 24–30 months. Cf. § 3553(a)(4). That range is based in part on an unjustifiable enhancement for the sale of a firearm that Richard did not know was stolen. See U.S.S.G. § 2K2.1(b)(4)(A). "Research [shows] that firearm retailers often sell guns to ineligible persons (e.g., convicted felons, non-state residents) and report those guns lost or stolen in order to avoid liability if the gun is traced back to their establishment by federal and state authorities." United States v. Handy, 570 F.Supp.2d 437, 478 (E.D.N.Y. 2008). Although the enhancement is correctly applied in this case as a matter of the Guidelines, see United States v. Thomas, 628 F.3d 64 (2d Cir. 2010) (rejecting Handy's conclusion that scienter was required for the enhancement to apply), the lack of scienter certainly supports a variance. See Handy, 570 F. Supp. 2d at 480 ("Because it lacks a requirement of scienter, the enhancement does not reflect the seriousness of the offense, promote respect for the law or provide just punishment for the offense.").

Finally, imposing a sentence of time served in this case will not create any unwarranted sentencing disparity. See, e.g., United States v. Lavar McCray, 18 Cr. 34 (AT) (42-year-old defendant with a prior conviction for

Honorable Andrew L. Carter, Jr.                                    November 17, 2022
United States District Judge                                         Page 8 of 8

attempted robbery in the first degree who trafficked 10 guns and had a
Guidelines range of 27–33 months sentenced to one day of imprisonment).

## CONCLUSION

Richard has matured in real time since he committed this offense at
age 18.  Over the last 13 months on home detention, he has focused on doing
right and caring for his three young sons.  He knows better than anyone how
devastating a father's absence can be, and he is determined never again to do
anything that may cause his children to suffer by his absence the way he
suffered after his father's death.  The Court need not re-imprison Richard to
satisfy the purposes of § 3553(a)(2); it should therefore impose a sentence of
time served.

                                        Respectfully submitted,

                                        /s/
                                        Clay H. Kaminsky
                                        Assistant Federal Defender
                                        Federal Defenders of New York
                                        (212) 417-8749

cc:     AUSA Kaylan Lasky

# EXHIBIT A

November 16, 2022

Dear Honorable Judge Carter,

I, Carlesha Hall, write this letter regarding my brother Richard Hall. I know what he has been charged with, and it hurts to have to write this letter in hopes of helping Richard out. Because we are siblings, this letter may seem one sided, but I want to demonstrate how he is a good person.

Richard is my older brother; he is the closest brother to me out of the four I have in total. Growing up Richard and I have celebrated every birthday together in June due to us only being a year and a day apart. In 2014, my mom had been struggling almost all year. We resided in the shelter in the Bronx at the time, at our age and the period we were in it was embarrassing and shameful to be in the shelter. I was turning 12 this year and he was turning 13. My mom didn't have anything planned for us now due to financial struggles. Richard dreaded seeing me down and crying about how our birthdays were seeming to go. At only 13 years old, Richard went on the trains with our oldest brother and sold candy bars and fruits snacks to plan us a small party in the park with a few of our friends. This is the lengths he went to to support his family or make us any way happier.

Growing up Richard was the kind of person who would make you laugh off the simplest joke. He played sports, did afterschool activities, and was overall a generous person. The middle school we attended in the south Bronx was not a very safe environment. Early on in school we would go through lockdowns or be sent home in cabs due to all the issues in the surrounding area. Richard and I both experienced a traumatic event when after a school basketball game, our friend was sliced across his right side of the cheek. We were just in the wrong place at the wrong time, but Richard immediately took off his school uniform shirt and proceeded to cover the boy's wound in attempt to help stop the blood. He is a mindful person and would not leave anyone who was badly hurt or in a harmful situation.

I feel growing up Richard was very protective of me because I was his one and only baby sister. In the summer of 2016, my deceased father's sister messaged me on Facebook wanting to see Richard and me. We traveled to North Carolina together on a New York City Greyhound bus. This summer was the ending of Richard's first year in high school and the start to mine. In the time we were here for the summer I decided to start high school back in our hometown. Richard was not too fond of me living 600+ miles away from him and my immediate family. Because Richard was already in his sophomore year of high school, he had to go back home in the Bronx for school, while I was left in North Carolina to attend school myself.

Later that year, when Richard's first son ▮▮▮▮ was born, he was still in the Bronx and didn't know he was having a baby. As soon as he found out about the baby, rather than be in denial like most 15-year-olds would be, he did not run from it, he ran to it. My mother brought him back to Lenoir and contacted social services to do the DNA test, and once the paternity test came back everything changed. The older brother I once knew had then become a father.

Being a father at such an early age shaped Richard. Richard used to think about sports or funny videos or pranks, but after having a son, he started to worry about his financial status. He was stressed out and

felt pressured to provide for a baby at only 15 years old. My nephew didn't have the best mom, so he was left with us on multiple occasions with nothing, no clothes, no formula not even a diaper. Richard had to find income by selling his shoes or doing little jobs for our family such as yard work. We sat down and cried together numerous times about being poor or not having enough for my nephew's basic needs.

Being a father is the most important thing to my brother, all he ever wanted for his children is to have the life we had growing up before our father passed. I have watched this case really change his point of view when it comes to time. He now understands that he must do everything in his power to never be taken from them. Richard has spent his time since being released on bail watching his kids day to day, allowing my mom to work more and my nephew's mom as well. He is spending time with my son, ████, all the time in fear of him missing out on things. Not having Richard around is like losing another father figure and best friend to my son. He is the closest brother I have and uncle to my son ████. When ████ turned one in August, Richard surprised us by coming to the birthday party. He had told me he couldn't come because of his bail conditions, but he did get permission from Your Honor and we had a great time together. Richard can't see ████ as often as he would like to because of his home detention, but he calls me every day to talk to my son. And my son has the best time whenever he visits his uncle Ricky.

When his third son was born late last month, Richard called me when they rushed to the hospital. He had been anxious for months when he didn't know if he would be around to be part of that moment because of the sentencing day. When they had to rush Jauda to the back for an emergency C-section, they didn't let Richard come with her. I have never seen him worried like that. Usually, Richard is emotional just to himself, not sharing it with others. His family is the most important thing to him. Now, the baby has ████ and Richard is the one home with him every day while Jauda is at work. Jauda is dealing with the aftermath of the C-section and two small kids. She tells me Richard is the best support in her life. Richard is scared to leave them all behind.

Being home all this time has been good for Richard, and I've seen him grow up a lot. He's a lot more calm now. He used to flare up easily, now he has more patience. He understands he has a lot at stake. He tried to go to work, but not having a license, it was hard. I know when this is all over, he'll be motivated on his own to get a job and do things the right way. When our oldest brother comes down from New York to see us, we all get together, talk about what's going on, and cry together. Because Richard doesn't live with ████ he's missing a lot. He feels guilty being in this position because it means he can't be present for everything. ████ is five now, and just started Kindergarten. Richard has missed school events because he's not allowed to leave the house. I see guilt and remorse in him all the time. Having a son, I understand the weight Richard feels.

Richard has only ever been away from us for 2 or 3 weeks. Our dad got sick and died in a week. In our mind, a lot can happen in just days, let alone months or years. He worries what he might miss in our family if he goes to prison. This case has affected more than just Richard and me, it also has impacted my mother and his oldest son. ████ understands what is going on with his daddy more than I expected. When the sentencing date was over the summer, Richard and my mother had to tell him that Richard might not be there to drop him off on his first day of school due to daddy making mistakes. My

nephew's response was like any other 5-year old's, scared and sad to start school without his daddy. If Richard is to be sent away it will cause my nephew to experience anger and resentment towards my brother for missing other big steps with him.

Your Honor, I believe if Richard is allowed to stay home with us, he'll take steps forward to get his life in order with our support. He is already a dedicated and loving father, who has always prioritized providing for his sons. Years from now, I would love to see how he has evolved from this situation, even more than the changes I already see in him. I am afraid of him being alone since all we ever had was each other, our siblings, and our mother. Losing our father has created a bond that is hard to explain between all of us. I feel as though if Richard is not here with us it is going to cause lots of emotional trauma for all his family. I ask Your Honor to please allow these three boys to have what was taken from Richard as a child, a father they can go to every time they feel down, or if they want to simply see him, they can do so.

Sincerely,
Carlesha Hall

# EXHIBIT B

June 13, 2022

Dear Honorable Judge Carter,

My name is Khalil Abdus-Shahid. I am the maternal grandfather of Richard Hall and a vey integral part of his life. I've worked over 35 years in the service of others. For the last 24 years, I've been employed as a Child Protective Specialist for the great city of New York.

My grandson is so very important to me. When he resided in New York, he visited me regularly over the years. I've made it my business to stay in contact and visit with him and his siblings when they moved to Lenoir, North Carolina. Over the years, Richard has faced many obstacles in life. His maternal grandmother, Mrs. Carla Banner, never had the chance to meet her grandson, as she died of cancer before his birth. He also suffered the loss of his father, Craig Ashley Hall, at the tender age of 7. This has led to many moments of struggle for Rickie and his immediate family. Nevertheless, it is a credit to Richard that his mother, Nashia Banner-Hall, has never abandoned her responsibilities as a mother to him and his siblings.

There were many periods of financial hardship in Richard's childhood when his mother moved to New York and was unemployed, homeless and relying on public assistance and familial support to make ends meet. I assisted the family with school uniform purchases during primary and middle school.  I shared in the pleasure of being present as he graduated from one level to the next as any proud grandfather would.

Richard has expressed to me during many of our solitary talks how he really misses the times he spent with his dad. All of the holiday occasions held a special joy at that time as his parents established traditions of cooking, wrapping X-mas presents, dancing and singing at the birthdays of his brothers and sister. He was sorry that his dad could no longer share those experiences due to his untimely death. He died as a result of an abscess that burst during a period of winter play while they were sled riding with his siblings. He often expressed to me how he wished they could have gone to the dentist and had the abscess removed and maybe his whole life could have been different with his father by his side.

He's always promised me that when he had children, he would be a father to them much like his father was a father to him and his siblings. I can honestly say that my grandson has been making good on his commitment to his children. His efforts at such began when his eldest son's mother and her father attempted to keep his son while on the run from the law. He went to court with his mother and secured custody and has kept him with the aid of his mother and family in good stead.

My grandson is on the precipice of finding his future and developing into the fine young man that he has shown the promise of becoming. He intends to enter a GED program to complete his high school requirements and to secure gainful employment to be a more complete parent to his children and to contribute more to society in a positive way as a gainfully employed taxpayer. I believe in him and will continue to offer him my support and guidance. He worked while on house arrest, but due to not yet having a driver's license, he was unable to maintain employment without transportation to and from

work. He did demonstrate a willingness and effort toward working toward meeting the needs of his family.

Your Honor, my grandson has promised to take and teach me how to fish, which he is capable of on my next visit to North Carolina provided he is granted the freedom to do so. I look forward to spending some time with him as his birthday is approaching along with his uncle and sister as they usually celebrate together being June 26th, 27th and 28th. I pray that you will consider his youthfulness and promise of redemption when you consider his sentence. He has an extended family network willing to support him on the path of development toward becoming a positive member of society for the long haul. I take this time to thank you in advance of your decision and I hope that your vast experiences will allow you to weigh in my grandson's favor so he may overcome and reach the heights that lay before him.


Respectfully Submitted,
Khalil Abdus-Shahid

# EXHIBIT C

November 17, 2022

Dear Judge Andrew L. Carter,

My name is Jau'Da Killian and I am the girlfriend of Richard Hall. Richard and I have been together for almost 5 years, and I wouldn't want it any other way. He means so much to me and he is one of the most selfless and loving people I know. He will go over and beyond to make me and our kids smile, he is the best father and a good person. There is so much I can say about him and the great things he has done but watching him do anything in this world for our kids is definitely my favorite. Not only does he love his kids to death, but his whole family is his world. He is a call away to help anyone out in any situation. So many people look up to him and he's nothing but supportive.

Richard and I met five years ago when I was babysitting his oldest son, █████ for █'s mother. Really, I've known ██ for even longer than I've known Richard, and I love him like he was my own. The years I have been with Richard I watched him go through so much, and he pulled through everything he went through. He has made mistakes which he is very sorry for, but I do believe he truly took the time to learn from all of them. When I first met him, he had a smile that lit up my life, though I didn't know how much he was going through behind it. He was too strong to show it until we got deeper into the relationship and he opened up to me about his life. He's always been the one I can go to for anything, no doubt at all. He has helped me so much since the day we met.

For over a year, I've worked as an assistant operator at Sealed Air Corportation, which I can only do because Richard watches our son █████ all day while I'm at work. This is extra important now that we have two babies. On October 27, I gave birth to our second son, █████ Hall. Richard watches the boys, changes diapers, he cleans, does the housework, laundry, takes out the trash, cooks our meals. He really does everything for our family.

I have seen Richard lose multiple people close to him. He lost one of his closest friends, Tybo, recently and it hurts me to see him hurt. Richard had known Tybo since childhood and he died suddenly in a car accident. He talked to Tybo regularly about the case, and he helped him through it, encouraging him to stay positive. I can see how it pains him to have to go through this without Tybo, he cries because of it. He was supposed to be here to support Richard along with us, but Richard is super strong, and I know he can pull through. And, Tybo is right by Richard's side through every step even though he is no longer here physically. This year, Richard also lost his aunt, which devastated him. And, of course, he's never really recovered from the death of his father.

When thinking about his case, it hurts Richard to think that he may have to leave us, his kids, his mom, his siblings, his friends. We are all heartbroken and we hope he gets to stay with us because we know he will do right. He has learned so much from this case, things he didn't have a clue about before, and he has been on the right track, he has grown up so much and it's made him realize so much. Since the case, our relationship has been even stronger. We argue less, he is more patient, and I think we both remember what is really important in life. He talks about it non-stop and just hopes for the best every

single day. His heart races because of this case but he has stayed positive the whole time. He's done better and he won't make the same mistakes again. I pray he can be here to see our new baby boy grow up. He knows he cannot miss out on all the beautiful moments with his children. He also knows our family is counting on him. Even today, I'm at the hospital with ██████ because he is sick with ██████ ███████████████ . Richard is home with ██████ , our two-year-old, because he has ██████ ████████████████████████████ . With two sick babies, I don't know what I'd do without Richard around. It's hard to even think about.

Richard talks about going back to school and continuing his education all the time and I know for a fact he can do just that because of how smart he is. He tells me all the time that he can work while I stay home with the boys and he take care of us because that's just how kind hearted he is. Once he gets a good job I know he will be able to stay focused in it because he knows what's at stake. He knows I am here to help him through anything at all, I let him know it all the time and I talk to him positively to make sure he doesn't let it bother him too much because I have faith that we are going to get good news here soon.

I see a wonderful, bright future ahead of Richard and I know he can get through this right. I know he will do all he can to be the man and father that I and our children deserve. When he sets his mind to it, I know there's nothing in this world he can't pursue. I know he cannot wait until the day this is all over with. I have prayed so hard and I see nothing but greatness coming and I want him to know I love him through it all.


Sincerely,
Jau'Da Killian

# EXHIBIT D

June 14, 2022

Dear Honorable Judge Carter,

I, Nashia Banner, write this letter to you in regard to my son Richard Hall. I understand his charges, as well as his involvement in the case. As a mother I've taught all my children to admit to their wrongs and look for forgiveness.

I had Richard at the age of 19, while living with his father. Craig was a fantastic father and husband, he worked tremendously hard to ensure the family received anything we needed. In 2009, we suffered the immense loss of Craig due to an abscess tooth which led us to struggle. Our life took a drastic turn, we lost our home and had to live with family and friends. Residing with friends while living with five kids was incredibly challenging so I moved my family to my hometown New York.

During this time, we spent three years in the shelter where Richard and the kids watched me struggle working two jobs. My kids felt like they had to help but Richard felt he had to do more than the rest. To help pay bills around this time, he and two of his brothers went on the train and sold candy just to try and help with the load.

At the age at 15, my son learned that he was to become a dad. He took it hard at first. He felt like he let me down by bringing more onto our load. But Richard has been an amazing father.

My son confesses to me how he wants to be better for his sons. He wants to watch the birth of his upcoming son, due in November. With his dad not here, he tries to fulfill the outstanding shoes of Craig since it was cut short for him. He watches his oldest son when I am at work. ▮▮▮▮ starts school this year, which is a tremendous achievement Richard would love to be there for. His son ▮▮▮▮ is very aware and attentive in the situation. He knows he may lose his dad for a while. As a grandmother it has been very rough watching him ask, "so is my dad going away today?" We tell him we do not know what is going to happen, just pray for daddy.

I end this letter asking and pleading with the Court to show mercy on my son for the sake of his sons, his siblings, and me, his mother.

Nashia Banner

# EXHIBIT E

June 12, 2022

Dear Honorable Judge Carter,

I, Caasan Hall, write to you this letter to describe who my brother is, and shine light on his character. I'm Richard's oldest brother. I'm 23 years old and I live in the Bronx. I understand how severe the case is, but I can vouch that his actions here don't speak for who he is as a person. I know that Richard is a caring individual who always looks out for everyone's feelings around him. There's not a moment in time that I believe he would do anything to intentionally hurt another individual.

Growing up as kids after losing our father in 2009 was rough. Losing a parent can affect anyone and mess with their mental health. We went from having a house in North Carolina to living inside a shelter in New York City surrounded by even more violence in a dangerous community. The line between right and wrong was a very thin one growing up because we had to make ends meet, help our mom with things that were outside of her ability, and we had to raise ourselves and each other.

Honestly speaking, outside of my mother I don't know another person who has done more for me in my lifetime then Richard. Being the middle child, he was always overlooked by everyone else. I noticed that and tried to make him feel better when he was down. We would go to BJ's on 149th to buy candies to sell to people who were riding the subway. We sold dollar pieces of candy to raise enough money to help my mom with the rent and put food on the table. We sold comic books in middle school that we came up with ourselves for 50 cents a copy. I find that hilarious now, but that's something we did to try our best. We wouldn't take no for an answer, and we wouldn't settle.

Without the support of my brothers, I could've gone down a bad path. I didn't have the guidance of my father, but my brother Ricky was there for me. He gave me motivation to be better for all of us and showed me how to put a smile on my face when there was nothing to smile about. He's done more than enough for me to make up for the times I tried to comfort him during his darkest times. I wish I could've been there to also guide him through whatever actions landed him into this predicament.

I would hate to see my brother be removed from me, his two sons, mother and his child he's expecting. He would take back everything he did if given the opportunity to and he acknowledges the mistakes he made. I tried my best as the oldest brother to pick up the slack after losing our father and sometimes it wasn't enough. I'm grateful to have had my brother to help me be there for the rest of the family.

Being an aspiring artist myself I need the support of my number one fans, my family, the ones that are most loyal to me like my brother. I can't go on 100 percent knowing that my brother can't be there to share the experiences. Richard needs to be there for his soon to be three sons the way that my father wasn't there for us after his death. His loss affected me and my siblings terribly and I would hate for my nephews to endure the same fate due to a mistake Richard made in the past. I ask Your Honor to please keep my little brother out of jail, as I don't know what I or my family would do without him.

Sincerely,
Caasan Hall

# EXHIBIT F

June 13, 2022

Dear Honorable Judge Carter,

I write this letter to you about an extraordinary individual, who is the root and foundation of his own family he created, and also the main support system to his immediate family such as myself. Generous and kind are two of many things I can call Richard. I don't say this because of the relationship we share as uncle and nephew, I say this from countless experiences where Richard has shown leadership and stepped up to be his family's backbones in times of need.

My name is Ibn Khalil Abdus Shahid. I met my nephew Richard in the winter of 2010 after the passing of his late father Craig in December of the year prior. Richard's personality and character was always different than the rest of his siblings since the time we met. I am close in age to my nephews and was my father's only son growing up, so I grew a bond with my nephews like they were the brothers I never had. My bond was especially strong with Richard.

Transitioning from North Carolina to New York wasn't a smooth go for my sister, niece, and nephews. The passing of my sister's husband put them at hardship. They went from living in a two-story house to having to live six people in a one-bedroom shelter in the Bronx. Growing up we weren't as fortunate as other kids. I remember many times me Richard and the rest of my nephews would take the little bit of money our parents gave us and buy and sell water on the side of the road or sell candy on the public train system. To make ends meet and help my sister, my nephews would go the extra mile. It was so many of them in one household and their mom couldn't always do what other parents could.

Richard became a young father, at the early age of fifteen. Being a teen father isn't easy, speaking from my personal experience of having a child at eighteen, but one thing I can say is Richard is a remarkable father to his two sons ███ and ███ and he is expecting a new bundle of joy at the end of the year.  It would sadden me deeply if he missed the opportunity to raise his unborn child.

Growing up we all had bumps in the road and have learned from experiences throughout life. Richard was young when he took the actions that led up to the events that put him in the situation at hand. As a person, he's grown tremendously since the time he took the actions that bring us here today. I really hope Your Honor can have sympathy in sentencing Richard. He is a sincere individual who made a mistake, please forgive him for his. I love and appreciate Richard as not only a nephew but a brother, friend and confidant who I can come to when I'm in my times of weakness.

Sincerely,
Ibn Khalil A.

# EXHIBIT G






# A SHARED SENTENCE

the devastating toll of parental incarceration on kids, families and communities




APRIL 2016

# policy report

KIDS COUNT




THE ANNIE E. CASEY FOUNDATION

## ABOUT THE ANNIE E. CASEY FOUNDATION AND KIDS COUNT

**The Annie E. Casey Foundation** is a private philanthropy that creates a brighter future for the nation's children by developing solutions to strengthen families, build paths to economic opportunity and transform struggling communities into safer and healthier places to live, work and grow. To learn more, visit www.aecf.org.

**KIDS COUNT®**, a project of the Annie E. Casey Foundation, is a national and state-by-state effort to track the status of children in the United States. By providing policymakers and citizens with benchmarks of child well-being, KIDS COUNT seeks to enrich local, state and national discussions concerning ways to secure better futures for all children. To learn more, visit www.aecf.org/kidscount.

To order this report, visit www.aecf.org/sharedsentence.

To find additional data on children and families, visit the KIDS COUNT Data Center at datacenter.kidscount.org.

# A SHARED SENTENCE
## the devastating toll of parental incarceration on kids, families and communities

**The saying is all too familiar: Do the crime, do the time. But in America's age of mass incarceration, millions of children are suffering the consequences of their parents' sentences and our nation's tough-on-crime practices.**

These children feel the absence of that adult — whether it is several nights in jail or years in prison — in myriad ways, even if they weren't sharing a home.[1] They feel it when their refrigerator is bare because their family has lost a source of income or child support. They feel it when they have to move, sometimes repeatedly, because their families can no longer afford the rent or mortgage. And they feel it when they hear the whispers in school, at church or in their neighborhood about where their mother or father has gone.

Incarceration breaks up families, the building blocks of our communities and nation. It creates an unstable environment for kids that can have lasting effects on their development and well-being.[2] These challenges can reverberate and multiply in their often low-income neighborhoods, especially if they live in a community where a significant number of residents, particularly men, are in or returning from jail or prison.[3] And different obstacles emerge once parents are released and try to assume their roles as caregivers, employees and neighbors.

This report recommends policies and practices that put the needs of children of incarcerated parents first. We call on correctional systems, communities and state and local public agencies to help stabilize families and preserve their connections during incarceration — and successfully move forward once parents come home.

As the U.S. prison population surged during the past several decades, so too did the number of children and families experiencing the consequences of having a loved one incarcerated.[4] From 1980 to 2000, the number of kids with a father in prison or jail rose by 500 percent.[5] Now more than 5 million children have had a parent incarcerated at some point in their lives, including 503,000 in California, 477,000 in Texas and 312,000 in Florida. The situation is even worse in many other states, especially Kentucky, which has the highest rate of children — 13 percent — who have had a parent incarcerated.[6]

There is no question that our country's practice of mass incarceration is flawed, costly and in need of change. Policymakers on both sides of the aisle have pushed for

## Jail vs. Prison

While definitions vary by state, jails generally fall under local jurisdiction. They confine individuals who are awaiting trial or sentencing, or who have sentences shorter than one year, usually for misdemeanors. Prisons are state or federal facilities for individuals who have committed felonies or have sentences longer than one year.[7] Although our focus is primarily on children whose parents are serving prison sentences, jail time can be equally disruptive to families, making it difficult for remaining caregivers to maintain a job, housing and child care.

better solutions,[8] and several states have overhauled their correctional systems, favoring less costly alternatives for addressing nonviolent offenses, while maintaining public safety.[9] Many advocacy efforts also recognize the wildly disproportionate impact of the criminal justice system on people of color, especially African-American men, who are far more likely to be arrested and spend time behind bars.[10] As a result, children of color are inevitably more likely to contend with having a parent in prison.[11]

Yet policy debates about incarceration rarely focus on the burden borne by children and families. Theirs are stories of things lost: connections, jobs, income, homes — and hope. And communities, in turn, suffer from losing so many parents, whose absence leaves the economic and social fabric of their neighborhoods in tatters.

While momentum for criminal justice reform continues to build, we know progress will take time. But we also know children can't wait — nor can we as a nation afford to let them and their parents flounder, perpetuating poverty from one generation to the next.[12] Children need stability and support to minimize the impact of incarceration on their lives, which requires families and communities equipped to properly care for them, as well as parents prepared to provide for them and contribute to their communities upon release.

### THE CHILDREN AND FAMILIES LEFT BEHIND

Nationally, the number of kids who have had a parent in jail or prison at some point in their childhood hovers around 5.1 million — a conservative estimate. Among states, the percentage of children with an incarcerated parent varies dramatically, from only 3 percent in New Jersey to 13 percent in Kentucky.[13]

Overwhelmingly, incarcerated parents are fathers, many of them young. In state and federal prisons, about 45 percent of men age 24 or younger are fathers. For the same age group, about 48 percent of women in federal prison and 55 percent in state facilities are mothers. Although the percentages are higher for women, the actual numbers of mothers behind bars are a fraction of those for fathers, mirroring the total prison population.[14] The number of children with a father in prison rose by more than half between 1991 and 2007, and those with a mother behind bars more than doubled.

Children with a parent who is incarcerated are typically younger and living in low-income families of color, usually with a young single mother who has limited education.[15] Most are younger than 10. More than 15 percent of children with parents in federal prison — and more than 20 percent with parents in state prison — are 4 or younger.[16] Compared with their white peers, African-American and Latino kids are over seven and two times more likely, respectively, to have a parent incarcerated.[17] Although national data on American Indian children are unavailable, state trends show a similar pattern: American Indian kids in Oklahoma are twice as likely as white children to have an incarcerated parent and about five times more likely in the Dakotas.[18]

Even if parents were not living with their children before incarceration, more than half provided the primary financial support.[19] Children with incarcerated mothers are more likely than those with incarcerated fathers to end up living with grandparents or family friends or in foster care — and, as a result, tend to experience greater disruption and instability.[20]

Kids with incarcerated parents also are significantly less likely to live in neighborhoods that are able to be supportive of families. Their parents are more likely to report feeling unsafe in their communities and less likely to feel they have people on whom they can rely for help with their children.[21]

## WHAT PARENTAL INCARCERATION MEANS FOR KIDS, THEIR FAMILIES AND COMMUNITIES

For children and families, incarceration is not a one-time event but a daily reality that lasts well beyond a jail sentence or prison term. Without links between and among the criminal justice system and schools, neighborhood health centers and other community- and faith-based agencies and programs, families have little to guide them through this time.

### An Added Financial Burden

Incarceration is a destabilizer, pushing families teetering on the edge into financial disaster. Losing a parent who is the breadwinner, often for a prolonged period, leaves families scrambling to cover basic needs along with legal and other court fees.[22] When fathers are incarcerated, family income can drop by an average of 22 percent.[23] When no parent remains to care for a child, extended family members step in — often without proper support.[24]

This loss of income creates ripples that grow into waves. Families who already relied on public programs, such as the Supplemental Nutrition Assistance Program and Temporary Assistance for Needy Families, become increasingly dependent on them.[25] As they shoulder more responsibilities to fill the breach, parents and other relatives can struggle to manage their finances and face reduced earning potential.[26] Parents left behind are more likely to cite problems with child care as a reason for quitting or not taking a job.[27] Mothers also report being unable to pay for necessities such as food, utilities, rent and medical care for their children.[28] A recent survey found that 65 percent of families with a member in prison or jail could not meet basic needs. Thousands of dollars in court-related fines and fees, along with costly visits to maintain contact, landed nearly one-third in debt.[29]

In addition, children of incarcerated parents move more frequently than their peers, even more so when both parents are imprisoned.[30] Kids with fathers in prison, particularly African-American children, are at greater risk of ending up homeless.[31] Indeed, research suggests the rise in incarceration over several decades has contributed to a significant increase in child homelessness, especially among African Americans.[32] Housing instability disrupts connections with family, friends, schools and other support networks.[33]

### A Blow to Child and Family Health and Well-Being

Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce, with a potentially lasting negative impact on a child's well-being.[34] These young children lose a parent's support during their critical early years, a time when their families and communities should be laying the foundation for healthy development and success.[35] Their bonds to that parent are weakened, or sometimes never formed, as distance may keep them from making regular visits. The loss of that bond is especially devastating for children with incarcerated mothers.[36] The trauma of being separated from a parent, along with a lack of sympathy or support from others, can increase children's mental health issues, such as depression and anxiety, and hamper educational achievement.[37] Kids of incarcerated mothers, in particular, are at greater risk of dropping out of school.[38] Teachers can further undermine children's performance and self-esteem by lowering their academic expectations.[39] And when these kids grow up, they are more likely to contend with poor mental and physical health.[40]

Single mothers left to take on unexpected financial responsibilities[41] may also suffer from poor health, addiction, depression or anxiety, or they may be dealing with their own traumatic experiences.[42] Bearing

Having a parent incarcerated is a stressful, traumatic experience of the same magnitude as abuse, domestic violence and divorce.

**If incarceration rates hadn't increased during a 24-year period, the U.S. poverty rate would have fallen by 20 percent, rather than remaining relatively steady.**

those conflicted emotions and stress makes it all the more challenging to be the port in a storm for their children.

### A Drain on Community Resources and Opportunity

The communities where children live don't go unscathed, either. Many are mired in poverty and contend with crime, poor-quality housing, low-performing schools and a dearth of resources that further prevent families from creating a safe and nurturing home environment.[43] The effects of incarceration exacerbate the situation.[44] One study found that if incarceration rates hadn't increased during a 24-year period, the U.S. poverty rate would have fallen by 20 percent, rather than remaining relatively steady.[45]

In areas where a sizable portion of residents are behind bars, the effect is cumulative: The sheer number of absent people depletes available workers and providers, while constraining the entire community's access to opportunity — including individuals who have never been incarcerated.[46] The continual cycle of residents going to and returning from prison makes for places, and faces, constantly in flux.[47] Just living in a neighborhood with a high incarceration rate increases residents' chances of suffering from depression and anxiety.[48] Even for residents who have had no contact with the criminal justice system, heightened police vigilance can cast a shadow over their children, families and homes. And the absence of parents, most of them fathers, weakens neighborhoods and tears apart social networks, which, in turn, affects the local economy.[49] Parents' inability to find work when they return home further destabilizes their communities and increases their likelihood of reverting to criminal activity.

### New Obstacles for Families When Parents Return

**Barriers to Employment.** Time behind bars limits parents' options for steady employment that pays well enough to support their kids. Their lack of training or work experience and an interrupted or illegitimate employment history, combined with typically low literacy levels and educational attainment, close the doors to most family-supporting jobs.[50] Having to check the box on a job application that confirms their criminal record seals those doors tight.[51]

As a result, when parents who have spent time in prison can find jobs, they work fewer weeks annually and earn less than their counterparts without a record.[52] Two-thirds of formerly incarcerated men at the bottom of the income ladder in 1986 remained there two decades later.[53] Families with fathers who have been incarcerated are more likely to live in poverty than those who have never experienced the effects of incarceration.[54]

**Barriers to Housing.** Returning parents struggle to find or maintain safe, stable housing for their families or, if they live apart, just for themselves. Although the U.S. Department of Housing and Urban Development's public housing regulations permit them as residents, local housing authorities can exercise discretion — and frequently do, with blanket bans on people with criminal records. Private landlords automatically reject these individuals without considering whether their criminal histories pose any danger to other residents.[55]

All of these challenges — financial and housing instability, stress, emotional difficulties, broken family relationships and communities ill-equipped to bolster children amid great uncertainty — are a minefield nearly impossible for kids to traverse without incident. Changes in state and federal policies, as well as targeted reinvestment of funds saved from recent criminal justice reform efforts, can significantly change the trajectory of children with a parent in prison, helping them navigate choppy waters with greater ease.

**TABLE 1**

## Children Who Have Experienced Parental Incarceration: 2011–2012

Nationally, the number of kids who have had a parent in jail or prison at some point in their childhood hovers around 5.1 million — a conservative estimate. Kids with incarcerated parents are significantly less likely to live in neighborhoods that are able to be supportive of families.

| | Total | | | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number | Percentage | | | Number | Percentage |
| United States | 5,113,000 | 7 | | Missouri | 98,000 | 7 |
| Alabama | 88,000 | 8 | | Montana | 18,000 | 8 |
| Alaska | 18,000 | 10 | | Nebraska | 41,000 | 9 |
| Arizona | 138,000 | 9 | | Nevada | 55,000 | 8 |
| Arkansas | 61,000 | 9 | | New Hampshire | 15,000 | 5 |
| California | 503,000 | 5 | | New Jersey | 65,000 | 3 |
| Colorado | 60,000 | 5 | | New Mexico | 52,000 | 10 |
| Connecticut | 36,000 | 5 | | New York | 148,000 | 4 |
| Delaware | 15,000 | 8 | | North Carolina | 179,000 | 8 |
| District of Columbia | 9,000 | 8 | | North Dakota | 10,000 | 7 |
| Florida | 312,000 | 8 | | Ohio | 271,000 | 10 |
| Georgia | 189,000 | 8 | | Oklahoma | 96,000 | 10 |
| Hawaii | 16,000 | 5 | | Oregon | 68,000 | 8 |
| Idaho | 35,000 | 8 | | Pennsylvania | 181,000 | 7 |
| Illinois | 186,000 | 6 | | Rhode Island | 10,000 | 5 |
| Indiana | 177,000 | 11 | | South Carolina | 73,000 | 7 |
| Iowa | 58,000 | 8 | | South Dakota | 17,000 | 8 |
| Kansas | 45,000 | 6 | | Tennessee | 144,000 | 10 |
| Kentucky | 135,000 | 13 | | Texas | 477,000 | 7 |
| Louisiana | 94,000 | 8 | | Utah | 44,000 | 5 |
| Maine | 20,000 | 8 | | Vermont | 7,000 | 6 |
| Maryland | 82,000 | 6 | | Virginia | 103,000 | 6 |
| Massachusetts | 69,000 | 5 | | Washington | 109,000 | 7 |
| Michigan | 228,000 | 10 | | West Virginia | 34,000 | 9 |
| Minnesota | 67,000 | 5 | | Wisconsin | 88,000 | 7 |
| Mississippi | 55,000 | 7 | | Wyoming | 12,000 | 9 |

**SOURCE** Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. These data only include children whose incarcerated parent lived with them at some point.

# Incarceration's Toll on Communities

While incarceration hits children and their families hard, their communities also feel the blow. Many are already mired in poverty and contend with crime, poor-quality housing, low-performing schools and a dearth of resources that further prevent families from creating a safe and nurturing home environment. The effects of incarceration exacerbate the situation, particularly in areas where a sizable portion of residents are behind bars. The sheer number of absent people can constrain an entire community's access to opportunity — including individuals who have never been incarcerated.

A closer look at three U.S. cities reinforces these points and reveals how dramatically the impact of incarceration varies from one neighborhood to another. Yet certain themes transcend population size and geography. Communities with a consistently high and disproportionate rate of people returning from prison tend to have larger percentages of African-American residents, echoing our criminal justice system's uneven impact on people of color. They also often have the highest child poverty rates in their cities.

## ATLANTA

Atlanta is organized into 25 neighborhood planning units (NPUs). NPUs J, L, V and Z represent 11 percent of the city's population but are home to 25 percent of its residents returning from prison. All four communities, which are mostly African American, exceed the city's average child poverty rate, and NPUs L, V and Z more than double it. By contrast, only about 1 percent of returning individuals live in the majority-white NPU-E, although its population is nearly the same as the other four areas combined. All but two of Atlanta's predominantly African-American communities have higher-than-average percentages of residents returning from prison.



PRISON RELEASES PER 1,000 ADULTS

0–1.88

2.48–4.71

6.28–7.58

9.17–13.81

SOURCE Justice Mapping Center's analysis of 2010 data from the Georgia Department of Corrections and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

## INDIANAPOLIS

In Indianapolis, District 17's incarceration and reentry rates are the highest in the city and 18 times those of District 3, which has the lowest rates. Although each area comprises about 5 percent of the city's population, District 17 is home to 12 percent of all residents returning from prison. By comparison, District 3 is home to less than 1 percent. District 17's child poverty rate far exceeds the city average and is triple the rate in District 3; it also has almost three times as many African-American residents.



PRISON RELEASES PER 1,000 ADULTS

1.23–3.39

3.73–6.48

7.44–12.31

14.36–22.07

SOURCE  Justice Mapping Center's analysis of 2010 data from the Indiana Department of Correction and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

## PROVIDENCE

Fox Point and neighboring Lower South Providence each represent about 2 percent of Providence residents. But in Lower South Providence, the percentage of people returning from prison is five times higher, at 5 percent, than Fox Point's 1 percent. Lower South Providence also has the city's highest child poverty rate, which is more than triple that of its neighbor. More than 35 percent of its residents are African American, compared with only 1 percent in Fox Point.



PRISON RELEASES PER 1,000 ADULTS

0–2.89

4.03–8.96

10.95–15.84

21.93–33.28

SOURCE  Justice Mapping Center's analysis of 2010 data from the Rhode Island Department of Corrections and the U.S. Census Bureau's American Community Survey for the Annie E. Casey Foundation.

# RECOMMENDATIONS
## building a stronger support system for children

**Children of incarcerated parents — like all children — need strong, supportive families and communities. Making smart investments in them, their families and the places where they live can help ensure they have solid support systems.**

One key source for these investments could be savings from the national Justice Reinvestment Initiative, which focuses on creating a more cost-effective approach to criminal justice, while maintaining public safety. Several states participating in the initiative, including Arkansas, Georgia and Louisiana, have redirected funds to community-based treatment programs, transitional housing or reentry support.[56] As more states continue to save, they could funnel some of these funds toward programs and tools to help promote healthy child development and strengthen families and communities.

Although such investments are critical, the most powerful step, by far, is to reduce our nation's overreliance on incarceration. The Justice Reinvestment Initiative, as well as the Annie E. Casey Foundation's decades of work in juvenile justice, clearly shows that significantly reducing our use of correctional facilities saves money without compromising public safety — and focuses attention on lasting solutions that allow people to succeed and leave their criminal past behind them, instead of reliving it.[57]

Taking this step means reexamining our nation's decades-old policies on sentencing, bail, probation and parole, exploring shorter sentences and alternatives to jail and prison for nonviolent crimes, which represent the majority of offenses among people serving time.[58] It also means curbing the use of jails to hold people awaiting trial who can't afford bail and, consequently, end up losing jobs, child care or homes — even if they are absolved of wrongdoing. These fundamental changes to America's criminal justice system would dramatically decrease the number of people — and, therefore, parents — behind bars, the amount of time they stay there and the effects of their absence on their children, families and neighborhoods. Though some states have already moved in this direction, it is time that we as a nation revisit our notion of criminal justice and eliminate flawed policies and practices that unnecessarily and unfairly emphasize stringent approaches to meting out punishment.

Given the criminal justice system's overwhelmingly uneven impact on

children of color, discussions around policy and practice changes should evaluate the potential effect on these kids and their families — through racial equity impact assessments, for example — to avoid further harm.

Even as we continue pushing for comprehensive system reform, the urgent needs of children and families bearing the burdens associated with incarceration require us to act today. Within that context, we offer several recommendations for state and local policymakers, criminal justice systems, public agencies and community- and faith-based organizations to put children's best interests first when designing programs and policies around parents who are incarcerated.

### RECOMMENDATION ONE
#### Ensure children are supported while parents are incarcerated and after they return.

Children need permanent family connections and stability to do well, and their families need the financial and emotional wherewithal to support their well-being. Providing mental health and counseling programs to family members who step up as caregivers during incarceration can help children withstand the repercussions of this disruption in their lives.

Research shows preserving a child's relationship with a parent during incarceration benefits both parties. It also benefits society, reducing children's mental health issues and anxiety, while lowering recidivism and facilitating parents' successful return to their communities.[59] Few programs exist to support these relationships during incarceration, and, upon reunification, families are left to travel bumpy terrain on their own, from readjusting to life after prison to resuming parental roles. The minimal data available on children with incarcerated parents further complicate attempts to address their needs.

The very agencies and organizations that could help children and their families typically have no official or clear way to reach them. They also tend to operate in isolation, with different funding sources and guidelines that can further impede their ability to respond to child and family needs. The Children of Incarcerated Parents Bill of Rights offers a strong set of principles and recommendations for putting kids at the forefront before, during and after incarceration. It calls on police departments, courts, schools, correctional facilities and other institutions that touch children's lives to operate with them in mind.[60]

➡ State and federal criminal justice systems should preserve family connections during incarceration by encouraging judges and other key players to consider the impact on kids and families when making sentencing and prison-assignment decisions. These systems should require courts to inform local social service agencies and community-based organizations when a parent is incarcerated so that they can make contact with families. Prisons and jails also should develop visitation policies that allow children to maintain their parental relationships, such as providing transportation and family-friendly visiting centers in their facilities or offering other means of communication, including videoconferencing.

Hawaii law, for instance, calls for the director of public safety to consider the best interests of families first when placing parents in correctional facilities — consistent with public safety and security — and to ensure their geographic proximity and ability to maintain bonds with their children.[61] In several New York state prisons, the Osborne Association's FamilyWorks program creates a more child-friendly






environment through family centers in prison visiting rooms, in addition to offering parenting courses and individual and family counseling.[62]

▬ Early education centers, schools, child welfare agencies, community-based health centers and other local and faith-based organizations should offer programs that foster children's mental and emotional well-being. They should also provide mentoring and support groups for kids and teens whose parents are in prison, as well as for their families. This includes establishing administrative policies and connections between and among prisons and child welfare, health, education and employment and training agencies and programs so that all are aware of families in need of support.

Atlanta's Foreverfamily, for example, has after-school and leadership programs for children and teens with incarcerated parents, creating space for them to interact with peers and coordinating visits to prisons. In New York, the Center for Community Alternatives offers mentoring and support groups for Syracuse public school students whose parents are incarcerated.

▬ To support appropriate and safe family reunification, prisons and community organizations should provide family counseling and parenting courses while parents are incarcerated and after they return. If children enter foster care, child welfare agencies and courts should prioritize placements with other family members or friends who can care for them in the absence of both parents. The National Fatherhood Initiative's InsideOut Dad helps incarcerated fathers connect with their families and build parenting skills. Correctional facilities in about 25 states, including Alabama, Florida, New Jersey and Virginia, have used this program, which has documented increases in fathers' confidence, parenting know-how and contact with their kids.[63]

▬ States should support family caregivers in meeting children's needs by facilitating their access to financial, legal, health, child care and housing assistance. They also should offer these family members counseling and support groups to bolster their ability to be a steady source of comfort for kids.[64]

The National Family Caregiver Support Program allows states to direct some of their funding toward providing

grandparents and other relatives ages 55 and older with services, counseling and additional tools. Washington has a strong state network of kinship navigators to connect families with legal resources, health care for kids and parenting classes, and Tennessee's Relative Caregiver Program works with community-based organizations to provide services for children, teens and caregivers.[65]

## RECOMMENDATION TWO
### Connect parents who have returned to the community with pathways to employment.

Upon release, parents face daunting tasks in trying to find work and rebuild their family and neighborhood networks. Obstacles to employment and restricted access to public programs such as food assistance hinder them from regaining their financial footing and supporting their children. Many parents leave prison with significant debts such as court fees — including bail and fines accrued before sentencing — as well as accumulated child support, with little means to pay them.[66] Automatic paycheck deductions for these debts can discourage parents from seeking legitimate avenues of work. Being unable to meet these obligations can unleash a vicious cycle: Not making required payments can lead to revoked parole and a return to prison, where parents are still unable to make payments.

Without education, training and work experience, parents who have been incarcerated can't compete for today's family-supporting jobs. They may also be dealing with traumas related to imprisonment that make it challenging to hold a job. While many prisons offer vocational training, it often falls short of teaching the skills that today's employers seek.

Providing sector-specific education and training — starting in prison — for jobs in high-demand industries such as information technology can help parents develop the skills necessary to resume their role as providers, while reducing their likelihood of returning to prison.[67] Research indicates that participating in prison education and training programs lowers the chances of reincarceration and increases the likelihood of securing employment.[68] In addition, every dollar spent on such programs cuts incarceration costs by four or five times that amount.[69] Beyond saving money, removing barriers to work could boost the economy, with increased income and sales tax contributions from gainfully employed parents.[70] Even when families do not reunite, it is important to equip parents to be effective providers and community members.

➡ States should take advantage of newly raised thresholds for funding prison education programs under the federal Workforce Innovation and Opportunity Act and direct more funds toward education and training for incarcerated individuals, preparing them for work in high-demand sectors. To meet the needs of today's job market, public and private employment and training programs should move beyond placing individuals with records in a handful of industries, such as construction or manufacturing, in which a criminal history isn't an automatic strike. Instead, they should identify a broader range of jobs and fields to target and help interested adults develop the skills necessary to start their own business.

For example, a training program in California's San Quentin State Prison teaches computer coding to open doors to jobs in technology. And a landscaping and horticultural program in Philadelphia prisons that provides job-placement assistance has reduced recidivism among participants to less than half of the city's rate.[71]

Without education, training and work experience, parents who have been incarcerated can't compete for today's family-supporting jobs.

The high-poverty neighborhoods that are home to many kids and families dealing with incarceration lack quality affordable housing, access to jobs, good schools and key resources.

➧ States should minimize the effects of a criminal record through ban-the-box policies that require public and private employers to postpone criminal history questions until they have chosen an applicant as one of the most qualified job candidates. Nearly 20 states — including Connecticut, Georgia and Minnesota — and more than 100 cities and counties, along with a number of businesses, have adopted ban-the-box policies. Several jurisdictions have documented a resulting increase in hiring individuals with records.[72] States also should use subsidized employment programs, which cover part of participants' wages for a trial period to help them prepare for permanent employment. Such programs incentivize employers in sectors that do not usually consider applicants who have a record.[73]

➧ States should enable families to access public programs such as the Supplemental Nutrition Assistance Program and Temporary Assistance for Needy Families so they can cover basic needs as formerly incarcerated parents work to earn income and achieve self-sufficiency. Although federal law prohibits people convicted of felony drug offenses from accessing both programs, states can choose to opt out or limit the ban. Many have done so, but several still have not.[74]

➧ States should suspend child support orders while parents are in prison so they don't accumulate crippling debt that they must start paying upon release. The District of Columbia and several dozen states, including Arizona and Michigan, allow incarcerated fathers to have their payments reduced or halted during their time in prison. California goes further, suspending child support orders if a parent is incarcerated for more than three months and unable to make payments.[75] Every state should offer to suspend such payments and proactively make parents aware of this option.

## RECOMMENDATION THREE
### Strengthen communities, particularly those disproportionately affected by incarceration and reentry, to promote family stability and opportunity.

The communities where children reside can make or break a family's stability. Increasing communities' access to opportunity and strengthening community-based organizations and programs can help entire neighborhoods — and, therefore, the families living in them — minimize the economic and social effects of incarceration. The high-poverty neighborhoods that are home to many kids and families dealing with incarceration lack quality affordable housing, access to jobs, good schools and key resources. Together, these factors can impede children's academic success and increase their likelihood of dropping out of school. Growing up in such neighborhoods also lowers kids' chances of climbing the economic ladder as adults.[76]

Stronger, safer and healthier neighborhoods can reduce not only the likelihood of crime but encounters with law enforcement and the criminal justice system.

➧ Being able to obtain safe and stable homes bolsters child well-being and reduces recidivism.[77] State and local governments should provide incentives for housing authorities and private landlords to lift restrictions on people with records so that families can remain in or access safe, affordable housing. They also should offer training for property managers and caseworkers to ensure they properly interpret housing policies to enable formerly incarcerated parents to live with their families, as appropriate.

In Oregon, private landlords cannot discriminate based on a person's arrest record or certain types of convictions. Landlords in Newark, New Jersey, must weigh factors such as references for good conduct and the nature of a person's






criminal history in determining whether he or she can rent a home.[78] And a pilot program with the Housing Authority of the City of Los Angeles uses Section 8 vouchers to support family reunification.[79]

➥ To create additional pathways to jobs and careers, city governments and private employers should, when possible, take advantage of universities, hospitals and other anchor institutions[80] that are rooted in communities and promote economic inclusion strategies. The latter intentionally connect low-income residents and neighborhoods with job and contracting opportunities generated from economic development projects. Economic inclusion and anchor institution policies and programs should include the hiring of formerly incarcerated individuals, along with related training to ensure returning parents can access local jobs. These institutions also could support local businesses owned by individuals who were incarcerated.

For example, Cleveland's Evergreen Cooperative Initiative — a partnership of the Cleveland Foundation, the Cleveland Clinic, University Hospitals, Case Western Reserve University and city government — promotes the development of local,

employee-owned businesses that train and hire low-income residents who are struggling to obtain employment, including people who were incarcerated.

## CONCLUSION

Without a doubt, people who break the law should face the consequences. Still, parents who are incarcerated do not live in isolation: They are fathers, mothers, partners, caregivers, breadwinners and community members, and their kids inevitably end up sharing their sentences.

Built into the very essence of the American Dream is the belief that children can, and should, have the opportunity to forge their own path, to reach far and stretch wide, regardless of where they grow up or who their parents are. The confinement of a parent should not doom a child to a lifetime of closed doors. Our hopes and dreams for children of incarcerated parents should be no different from the limitless horizon we seek for all of our children. They too deserve a blank page in our nation's great storybook — and the chance to shape their part of the tale as it continues to unfold for themselves, their future families and our whole country.

# ENDNOTES

1. Geller, A., Cooper, C. E., Garfinkel, I., Schwartz-Soicher, O., & Mincy, R. B. (2012, February). Beyond absenteeism: Father incarceration and child development. *Demography, 49*(1), 49–76. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC3703506

2. This is well documented in a variety of studies. See, for example, Hairston, C. F. (2007, October). *Focus on children with incarcerated parents: An overview of the research literature*. Baltimore, MD: The Annie E. Casey Foundation. Retrieved from www.aecf.org/m/resourcedoc/aecf-FocusonChildrenwith_ncarceratedParentsOverviewofLiterature-2007.pdf. And, Wildeman, C., & Western, B. (2010). Incarceration in fragile families. *The Future of Children, 20*(2), 157–177. Retrieved from www.futureofchildren.org/futureofchildren/publications/docs/20_02_08.pdf. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). Parental incarceration and child wellbeing: Implications for urban families. *Social Science Quarterly, 90*(5), 1186–1202. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC2835345. And, Lee, R. D., Fang, X., & Luo, F. (2013, April). The impact of parental incarceration on the physical and mental health of young adults. *Pediatrics, 131*(4), 1188–1195. Retrieved from www.ncbi.nlm.nih.gov/pubmed/23509174

3. Clear, T. R. (2008). The effects of high imprisonment rates on communities. *Crime and Justice, 37*(1), 97–132. Retrieved from http://myweb.fsu.edu/bstults/ccj5625/readings/clear-cj-2008.pdf

4. Wildeman, C., & Western, B. (2010). And, The Sentencing Project. (2015, November). *Fact sheet: Trends in U.S. corrections*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/inc_Trends_in_Corrections_Fact_sheet.pdf

5. Western, B., & Wildeman, C. (2009, January). The black family and mass incarceration. *The ANNALS of the American Academy of Political and Social Science, 621*(1), 221–242. Retrieved from http://scholar.harvard.edu/files/brucewestern/files/westernwildeman09.pdf?m=1378178398

6. Murphey, D., & Cooper, P. M. (2015, October). *Parents behind bars: What happens to their children?* Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2015/10/2015-42ParentsBehindBars.pdf. And, Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

7. Bureau of Justice Statistics. (n.d.). *FAQ detail: What is the difference between jails and prisons?* Retrieved from www.bjs.gov/index.cfm?ty=qa&iid=322

8. Lillis, M. (2015, October 7) House leaders to unveil bipartisan criminal justice reforms. *The Hill*. Retrieved from http://thehill.com/homenews/house/256221-house-leaders-to-unveil-bipartisan-criminal-justice-reforms. And, Levy, G. (2015, October 1). Criminal justice reform bill hailed as bipartisan breakthrough. *U.S. News & World Report*. Retrieved from www.usnews.com/news/articles/2015/10/01/senates-criminal-justice-reform-bill-hailed-as-bipartisan-breakthrough

9. Gelb, A. (2015, July 30). *State criminal justice reforms build the case for data-driven federal legislation*. Washington, DC: The Pew Charitable Trusts. Retrieved from www.pewtrusts.org/en/research-and-analysis/analysis/2015/07/30/state-criminal-justice-reforms-build-the-case-for-data-driven-federal-legislation

10. Heath, B. (2014, November 19). Racial gap in U.S. arrest rates: "Staggering disparity." *USA Today*. Retrieved from www.usatoday.com/story/news/nation/2014/11/18/ferguson-black-arrest-rates/19043207

11. The Sentencing Project. (2009, February). *Incarcerated parents and their children: Trends 1991–2007*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/publications/inc_incarceratedparents.pdf

12. DeFina, R. H., & Hannon, L. (2009, February 23). The impact of mass incarceration on poverty. *Crime & Delinquency*. Retrieved from http://ssrn.com/abstract=1348049

13. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. This estimate only includes children whose incarcerated parent lived with them at some point. In this report, we rely on a variety of data sources to tell the story of children of incarcerated parents, their families and their communities. Because sources may have different data-collection methods, national estimates may vary by data source. See, for example, Murphey, D., & Cooper, P. M. (2015, October). And, Wildeman, C., & Western, B. (2010).

14. Glaze, L. E., & Maruschak, L. M. (2008, August). *Parents in prison and their minor children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs. Retrieved from www.bjs.gov/content/pub/pdf/pptmc.pdf

15. Murphey, D., & Cooper, P. M. (2015, October). And, Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September). The effect of paternal incarceration on material hardship. *The Social Service Review, 85*(3), 447–473. Retrieved from www.ncbi.nlm.nih.gov/pmc/articles/PMC4020140

16. Glaze, L. E., & Maruschak, L. M. (2008, August). And, Hairston, C. F. (2007, October).

17. The Sentencing Project. (2009, February).

18. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation. Although national data for American Indian children are unavailable, the statistics on incarceration among men and women suggest that they, too, are more likely to have an incarcerated parent than their white peers. American Indian men are four times more likely to be incarcerated than their white counterparts; American Indian women are six times more likely to be incarcerated. For more information, see Lakota People's Law Project. (2015, February). *Native lives matter*. Santa Cruz, CA: Author. Retrieved from www.docs.lakotalaw.org/reports/Native%20Lives%20Matter%20PDF.pdf

19. Glaze, L. E., & Maruschak, L. M. (2008, August). And, La Vigne, N. G., Davies, E., & Brazzell, D. (2008, February 12). *Broken bonds: Understanding and addressing the needs of children with incarcerated parents*. Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/broken-bonds-understanding-and-addressing-needs-children-incarcerated-parents/view/full_report

20. National Resource Center on Children & Families of the Incarcerated. (2014). *Children and families of the incarcerated fact sheet*. Camden, NJ: Rutgers University. Retrieved from https://nrccfi.camden.rutgers.edu/files/nrccfi-fact-sheet-2014.pdf. And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014). *The growth of incarceration in the United States: Exploring causes and consequences*. Washington, DC: The National Academies Press. Retrieved from www.nap.edu/read/18613/chapter/11#274. doi: 10.17226/18613. And, Dallaire, D. H. (2007, December). Incarcerated mothers and fathers: A comparison of risks for children and families. *Family Relations, 56*(5), 440–453. Retrieved from http://onlinelibrary.wiley.com/doi/10.1111/j.1741-3729.2007.00472.x/abstract

21. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

22. Ella Baker Center for Human Rights. (2015, September). *Who pays? The true cost of incarceration on families*. Oakland, CA: Author. Retrieved from http://ellabakercenter.org/who-pays-the-true-cost-of-incarceration-on-families. And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 267. And, Arditti, J. A. (2005). Families and incarceration: An ecological approach. *Families in Society: The Journal of Contemporary Social Services, 86*(2), 251–260. Retrieved from www.convictcriminology.org/pdf/arditti/e-FamiliesIncarceration.pdf. And, Hairston, C. F. (1998, September/October). The forgotten parent: Understanding the forces that influence incarcerated fathers' relationships with their children. *Child Welfare, 77*(5), 617–639. Retrieved from www.ncbi.nlm.nih.gov/pubmed/9744076

23. Johnson, R. C. (2009). Ever-increasing levels of parental incarceration and the consequences for children. In S. Raphael & M. Stoll (Eds.), *Do prisons make us safer? The benefits and costs of the prison boom* (pp. 177–206). New York, NY: Russell Sage Foundation. And, The Pew Charitable Trusts. (2010). *Collateral costs: Incarceration's effect on economic mobility*. Washington, DC: Author. Retrieved from www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2010/collateralcosts1pdf.pdf

24. The Annie E. Casey Foundation. (2012). *Stepping up for kids: What government and communities should do to support kinship families* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/stepping-up-for-kids

25. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 267–268. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

26. Lynch, J. P., & Sabol, W. J. (2004, March). Assessing the effects of mass incarceration on informal social control in communities. *Criminology & Public Policy, 3*(2), 267–294. And, Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September).

27. Child Trends' analysis of the 2011–12 National Survey of Children's Health for the Annie E. Casey Foundation.

28. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

29. Ella Baker Center for Human Rights. (2015, September), p. 30.

30. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 274.

31. Princeton University. (2013, March). *Paternal incarceration and child homelessness* (Fragile Families Research Brief, No. 48). Retrieved from http://fragilefamilies.princeton.edu/sites/fragilefamilies/files/researchbrief48.pdf

32. Wildeman, C. (2014, January). Parental incarceration, child homelessness, and the invisible consequences of mass imprisonment. *The ANNALS of the American Academy of Political and Social Science, 651*(1), 74–96. Retrieved from http://ann.sagepub.com/content/651/1/74.abstract

33. Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

34. Murphey, D., & Cooper, P. M. (2015, October). And, Sacks, V., Murphey, D., & Moore, K. (2014, July). *Adverse childhood experiences: National and state-level prevalence* (Research Brief, Publication No. 2014-28). Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2014/07/Brief-adverse-childhood-experiences_FINAL.pdf

35. The Annie E. Casey Foundation. (2013). *The first eight years: Giving kids a foundation for lifetime success* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/the-first-eight-years-giving-kids-a-foundation-for-lifetime-success

36. Dallaire, D. H. (2007, December). And, Dallaire D. H. (2007, January/February). Children with incarcerated mothers: Developmental outcomes, special challenges, and recommendations. *Journal of Applied Developmental Psychology, 28*(1), 15–24.

37. Wildeman, C. (2014, September). *Parental incarceration and child wellbeing: An annotated bibliography*. Boston, MA: The Sills Family Foundation. Retrieved from http://johnjayresearch.org/pri/files/2012/03/Annotated-bib-with-coverpage_WEB-version.pdf. And, Wildeman, C., & Western, B. (2010). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 270–273. And, Federal Interagency Working Group for Children of Incarcerated Parents. (2013, June). *Promoting social and emotional well-being for children of incarcerated parents*. Washington, DC: Author. Retrieved from https://csgjusticecenter.org/wp-content/uploads/2013/06/Promoting-Social-and-Emotional-Well-Being-for-Children-of-Incarcerated-Parents.pdf

38. Dallaire, D. H. (2007, January/February).

39. Hairston, C. F. (2007, October). And, Dallaire, D. H., Ciccone, A., & Wilson, L. C. (2010). Teachers' experiences with and expectations of children with incarcerated parents. *Journal of Applied Developmental Psychology, 31*(4), 281–290. And, The Osborne Association. (2012, May). *Fact sheet: Parental incarceration's impact on children's health*. Bronx, NY: Author. Retrieved from www.osborneny.org/images/uploads/printMedia/Parental%20Incarceration's%20Impact%20on%20Children's%20Health%20Fact%20Sheet_Osborne.pdf

40. Murphey, D., & Cooper, P. M. (2015, October).

41. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), pp. 267–268. And, The Annie E. Casey Foundation. (2014). *Creating opportunity for families: A two-generation approach* (KIDS COUNT Policy Report). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/creating-opportunity-for-families

42. Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014).

43. Duncan, G. J., Magnuson, K., & Votruba-Drzal, E. (2014, Spring). Boosting family income to promote child development. *The Future of Children, 24*(1), 99–120. Retrieved from www.ncbi.nlm.nih.gov/pubmed/25518705. And, Turner, M. A., & Rawlings, L. A. (2005, July 29). *Overcoming concentrated poverty and isolation* (Executive Summary). Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/overcoming-concentrated-poverty-and-isolation-executive-summary

44. Clear, T. R. (2007, July). *Imprisoning communities: How mass incarceration makes disadvantaged neighborhoods worse* (Studies in Crime and Public Policy). Oxford, England: Oxford University Press.

45. DeFina, R. H., & Hannon, L. (2009, February 23).

46. Mitchell, M., & Leachman, M. (2014, October 28). *Changing priorities: State criminal justice reforms and investments in education*. Washington, DC: Center on Budget and Policy Priorities. Retrieved from www.cbpp.org/research/changing-priorities-state-criminal-justice-reforms-and-investments-in-education

47. Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 289. And, Clear, T. R. (2007, July).

48. Hatzenbuehler, M. L., Keyes, K., Hamilton, A., Uddin, M., & Galea, S. (2015). The collateral damage of mass incarceration: Risk of psychiatric morbidity among nonincarcerated residents of high-incarceration neighborhoods. *American Journal of Public Health, 105*(1), 138–143. Retrieved from www.ncbi.nlm.nih.gov/pubmed/25393200

49. Mitchell, M., & Leachman, M. (2014, October 28). And, Clear, T. R. (2008). And, Travis, J., Western, B., & Redburn, S. (Eds.). (2014), p. 289.

50. Coley, R. J., & Barton, P. E. (2006). *Locked up and locked out: An educational perspective on the U.S. prison population*. Princeton, NJ: Educational Testing Service. Retrieved from www.ets.org/Media/Research/pdf/PIC-LOCKEDUP.pdf. And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1).

51. Vallas, R., Boteach, M., West, R., & Odum, J. (2015, December 10). *Removing barriers to opportunity for parents with criminal records and their children: A two-generation approach*. Washington, DC: Center for American Progress. Retrieved from www.americanprogress.org/issues/criminal-justice/report/2015/12/10/126902/removing-barriers-to-opportunity-for-parents-with-criminal-records-and-their-children

52. Vallas, R., Boteach, M., West, R., & Odum, J. (2015, December 10). And, Geller, A., Garfinkel, I., Cooper, C. E., & Mincy, R. B. (2009, December 1). And, The Pew Charitable Trusts. (2010). And, Wildeman, C., & Western, B. (2010).

53. The Pew Charitable Trusts. (2010), p. 4.

54. Schwartz-Soicher, O., Geller, A., & Garfinkel, I. (2011, September).

55. Legal Action Center. (2014, July). *National blueprint for reentry: Equal opportunity housing for people with criminal histories* (2nd ed.). New York, NY: Author. Retrieved from http://lac.org/wp-content/uploads/2014/07/Reentry-Blueprint-Housing-Final-2014-08-14.pdf

56. La Vigne, N. G., Bieler, S., Cramer, L., Ho, H., Kotonias, C., Mayer, D., McClure, D., Pacifici, L., Parks, E., Peterson, B., & Samuels, J. (2014, January). *Justice reinvestment initiative: State assessment report*. Washington, DC: Urban Institute. Retrieved from www.urban.org/research/publication/justice-reinvestment-initiative-state-assessment-report

57. The Annie E. Casey Foundation. (2013, February 5). *Reducing youth incarceration in the United States* (A KIDS COUNT Data Snapshot). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/reducing-youth-incarceration-in-the-united-states

58. Wagner, P., & Rabuy, B. (2016, March 14). *Mass incarceration: The whole pie*. Northampton, MA: Prison Policy Initiative. Retrieved from www.prisonpolicy.org/reports/pie2016.html

59. La Vigne, N. G., Davies, E., & Brazzell, D. (2008, February 12). And, Shanahan, R., & Agudelo, S. V. (2012, September/October). The family and recidivism. *AMERICANJails*, 17–24. Retrieved from www.vera.org/files/the-family-and-recidivism.pdf. And, The Osborne Association. (2012, May).

60. For more on the Children's Bill of Rights, visit www.sfcipp.org

61. State of Hawaii, Senate, 24th Legislature. (2007). *A bill for an act relating to a comprehensive offender reentry system*. Retrieved from www.capitol.hawaii.gov/session2007/bills/Act8_SB932.pdf

62. For more information on FamilyWorks, visit www.osborneny.org/programs.cfm?programID=11

63. Economic Development Research Group. (2012, December). *Assessing the impact of the InsideOut Dad® program on Newark Community Education Center residents*. Newark, NJ: Rutgers University, School of Public Affairs and Administration. Retrieved from http://cdn2.hubspot.net/hub/135704/file-561437088-pdf/Research_Eval_Files/368_IoDEvalRpt_NREPP_120712.pdf. And, for more information on the InsideOut Dad program, visit www.fatherhood.org/evidence-based-programs

64. Bandy, T., Andrews, K. M., & Moore, K. A. (2012, February). *Disadvantaged families and child outcomes: The importance of emotional support for mothers* (Research-to-Results Brief, Publication No. 2012–05). Washington, DC: Child Trends. Retrieved from www.childtrends.org/wp-content/uploads/2012/02/Child_Trends-2012_03_21_RB_MaternalSupport.pdf. And, Gay, K. D. (2005, September/October). The Circle of Parents® program: Increasing social support for parents and caregivers. *North Carolina Medical Journal, 66*(5), 386–388. Retrieved from http://nciom.org/wp-content/uploads/NCMJ/sept-oct-05/Gay.pdf. And, The Annie E. Casey Foundation. (2013).

65. For more information on the National Family Caregiver Support Program, visit www.aoa.acl.gov/AoA_Programs/HCLTC/Caregiver. And, Generations United. (2015). *The state of grandfamilies in America*. Washington, DC: Author. Retrieved from www.gu.org/LinkClick.aspx?fileticket=nv03BXVlGAI%3d&tabid=157&mid=606. And, for more information on Tennessee's Relative Caregiver Program, visit www.kidcentraltn.com/article/relative-caregiver-program

66. The Pew Charitable Trusts. (2010).

67. Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013). *Evaluating the effectiveness of correctional education: A meta-analysis of programs that provide education to incarcerated adults*. Santa Monica, CA: Rand Corporation. Retrieved from www.rand.org/pubs/research_reports/RR266.html

68. The Pew Charitable Trusts. (2010). And, Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013).

69. Davis, L. M., Bozick, R., Steele, J. L., Saunders, J., & Miles, J. N. V. (2013).

70. National Employment Law Project. (2016, March). *Research supports fair chance policies* (Fact Sheet). New York, NY: Author. Retrieved from www.nelp.org/content/uploads/Fair-Chance-Ban-the-Box-Research.pdf

71. Kane, M. (2014, November 14). First-of-its-kind technology training program debuts at San Quentin State Prison. *Inside CDCR*. Sacramento, CA: California Department of Corrections and Rehabilitation. Retrieved from www.insidecdcr.ca.gov/2014/11/first-of-its-kind-technology-training-program-debuts-at-san-quentin-state-prison. And, for more information on the Roots to Re-Entry program, visit http://phsonline.org/programs/roots-to-re-entry

72. Rodriguez, M. N., & Avery, B. (2016, March 1). *Ban the box: U.S. cities, counties, and states adopt fair hiring policies* (Toolkit). New York, NY: National Employment Law Project. Retrieved from www.nelp.org/publication/ban-the-box-fair-chance-hiring-state-and-local-guide. And, Minnesota Department of Human Rights. (n.d.). *Ban the box FAQ for private employers*. St. Paul, MN: Author. Retrieved from http://mn.gov/mdhr/employers/banbox_faq_privemp.html. And, Atkinson, D. V., & Lockwood, K. (2014, October). *The benefits of ban the box: A case study of Durham, NC*. Durham, NC: The Southern Coalition for Social Justice. Retrieved from www.southerncoalition.org/wp-content/uploads/2014/10/BantheBox_WhitePaper-2.pdf

73. Duran, L., Plotkin, M., Potter, P., & Rosen, H. (2013, September). *Integrated reentry and employment strategies: Reducing recidivism and promoting job readiness*. New York, NY: Council of State Governments Justice Center. Retrieved from https://csgjusticecenter.org/wp-content/uploads/2013/09/Final.Reentry-and-Employment.pp_.pdf

74. The Sentencing Project. (2013). *A lifetime of punishment: The impact of the felony drug ban on welfare benefits*. Washington, DC: Author. Retrieved from www.sentencingproject.org/doc/publications/cc_A%20Lifetime%20of%20Punishment.pdf

75. Office of Child Support Enforcement, Administration for Children & Families, U.S. Department of Health and Human Services. (2012, June). *Realistic child support orders for incarcerated parents* (Child Support Fact Sheet Series, No. 4). Retrieved from www.acf.hhs.gov/sites/default/files/ocse/realistic_child_support_orders_for_incarcerated_parents.pdf

76. The Annie E. Casey Foundation. (2012, February 1). *Children living in America's high-poverty communities* (KIDS COUNT Data Snapshot on High-Poverty Communities). Baltimore, MD: Author. Retrieved from www.aecf.org/resources/data-snapshot-on-high-poverty-communities

77. Legal Action Center. (2014, July).

78. For more information about the Oregon and Newark, New Jersey, policies, visit www.osbar.org/public/legalinfo/1248_HousingDiscrimination.htm and https://newark.legistar.com/LegislationDetail.aspx?ID=1159554&GUID=6E9D1D83-C8D7-4671-931FEE7C8B2F33FD&FullText=1

79. For more information about the pilot program to provide housing to formerly incarcerated people in Los Angeles, visit http://housing.anewwayoflife.org/about-the-program

80. Kleiman, N., Getsinger, L., Pindus, N., & Poethig, E. (2015, September). *Striking a (local) grand bargain: How cities and anchor institutions can work together to drive growth and prosperity*. Washington, DC: National Resource Network. Retrieved from www.nationalresourcenetwork.org/en/Document/306220/Striking_a_Local_Grand_Bargain. And, The Democracy Collaborative at the University of Maryland. (2013, August 10). *Achieving the anchor promise: Improving outcomes for low-income children, families and communities*. Baltimore, MD: The Annie E. Casey Foundation. Retrieved from www.aecf.org/resources/achieving-the-anchor-promise

## ACKNOWLEDGMENTS

The Foundation thanks the many
staff members who contributed
to this KIDS COUNT policy report,
as well as Child Trends and the
Justice Mapping Center for providing
data analysis for this publication.

Permission to copy, disseminate or otherwise
use information from this report is granted.
To learn more, visit www.aecf.org/copyright.

Designed by KINETIK
www.kinetikcom.com

Photography © Jason Miczek,
Cynthia Sambro-Rier, Rebecca Drobis,
Imagesbybarbara, Edward Lara and YazolinoGirl

Printed and bound in the United States of America
on recycled paper using soy-based inks.

KIDS COUNT® is a registered trademark
of the Annie E. Casey Foundation.

© 2016 The Annie E. Casey Foundation






@aecfnews
@aecfkidscount

701 ST. PAUL STREET
BALTIMORE, MD 21202
410.547.6600
WWW.AECF.ORG






THE ANNIE E. CASEY FOUNDATION